Filed 6/18/14  In re B.W. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re B.W., a Person Coming Under the Juvenile Court Law. | B249284 (Los Angeles County Super. Ct. No. CK99111) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. W.W. et al., Defendants and Appellants. | |

APPEAL from orders of the Superior Court of Los Angeles County, Carlos E. Vasquez, Judge.  Affirmed.

Matthew I. Thue, under appointment by the Court of Appeal, for Defendant and Appellant W.W.

Eva Chick, under appointment by the Court of Appeal, for Defendant and Appellant S.N.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel and John C. Savittieri, Deputy County Counsel for Plaintiff and Respondent.

## I.  INTRODUCTION

W.W., the father, and S.N., the mother, appeal from the juvenile court's April 22, 2013 jurisdictional and dispositional orders concerning B.W., their daughter.  On November 4, 2012, according to the petition, there was an alleged domestic violence incident between the father and the mother.  The juvenile court found jurisdiction under Welfare and Institutions Code[1] section 300, subdivision (b) because the parents failed to protect the child from harm attendant to the acts of domestic violence.  The mother argues the petition failed to state a cause of action.  The mother also argues the juvenile court lacked jurisdiction.  The parents challenge the juvenile court's order removing the child from the father's custody.  The mother contends the juvenile court erred in its dispositional order by requiring she complete parenting classes and attend a domestic violence support group.  The father contends the juvenile court erred by requiring monitored visits between him and the child.

## II.  BACKGROUND

### A.  Procedural

On March 5, 2013, the Department of Children and Family Services (the department) filed a section 300 petition under subdivisions (a) and (b) on behalf of the child.  The department alleged the mother and the father were involved in a domestic violence incident on November 4, 2012.  The department alleged the child faced serious physical harm because of the violent altercations and the parents failed to protect her from these dangers.

At the detention hearing, the juvenile court found a prima facie case to detain the child from the father's custody.  The child remained in the mother's custody.  The father

---

[1]  All further statutory references refer to the Welfare and Institutions Code unless otherwise noted.

was given presumed father status and monitored visits with the child. The visits were for no less than four hours per week and the mother was not permitted to monitor the visitation.

The juvenile court struck the allegation that the father threatened to kill the mother. The sustained allegation, as amended, provides: "The [child's] mother . . . and father . . . have a history of engaging in violent altercations in the presence of the child. On 11/04/2012, the father choked the mother. The father struck the mother's face with the father's fists. The father grabbed the mother and shoved the mother into a door frame, causing the mother's head to hit a door frame. On a prior occasion in 2009, the father struck the mother with the father's fist, while the mother held the child. The mother failed to protect the child, in that the mother allowed the father to frequent the child's home and have unlimited access to the child. Such violent conduct on the part of the father against the mother and the mother's failure to protect the child endangers the child's physical health and safety and places the child at risk of physical harm, damage, danger and failure to protect."

The juvenile court: found there was a long domestic violence history between the mother and the father; found the father did not finish his domestic violence program in a timely manner; and was troubled by the mother protecting the father with her testimony. As noted, the father was ordered to participate in individual counseling and parenting and domestic violence classes. The mother was ordered to attend a domestic violence support group and a parenting class. The juvenile court ordered visits between the child and the father monitored by a neutral third party. The father and the mother filed notices of appeal on May 1, 2013.

## B. The Evidence

### 1. Detention report

On March 5, 2013, the department filed its detention report. The social worker reported on August 31, 2012, two Los Angeles police officers arrived at the mother's residence. The mother lived in the house with the child, and M.T., the mother's other daughter. M.T. was the mother's other daughter with a different man. The mother called the police and reported the father had allegedly locked her out of the home and took her cell phone. The mother was irate and screaming, "hollering" and cursing at the father when the police arrived. The mother did not listen to the officers when they tried to calm her down. The father, to stabilize the situation, agreed to stay at his sister's house.

On September 26, 2012, a social worker spoke to the mother. The mother explained she had secured a restraining order against the father. According to the mother, the father was restrained from harassing, stalking or threatening her. The father was also restrained from disturbing the peace or destroying her personal property. The mother said she and the father had a previous domestic violence incident in 2004. The mother reported she had participated in domestic violence classes. The social worker also interviewed the child. The child stated the father and the mother just argue. But the child said she felt safe at home. The child's mental status was observed to be appropriate and she was doing well in school.

On November 13, 2012, the department received another referral. The reporting party stated that on November 4, 2012, the father ordered the mother to get up. This was because he wanted to argue with the mother. The caller alleged the mother tried to leave. The father then grabbed the mother, slammed her into a doorjamb where she hit her head, strangled her and punched her on the forehead. The police were summoned. The police report submitted regarding this incident indicated the mother had visible injuries to her neck and small lumps on her forehead.

4

On February 8, 2013, the social worker interviewed the mother. The mother denied the domestic violence allegations. The mother denied having any visible marks from an altercation with the father. The mother contended someone was making up allegations because other people did not like the father having a continuing relationship with the child.

On February 8, 2013, the social worker interviewed the father regarding the domestic violence allegations. The father also denied the domestic violence allegations. The father stated it was a "usual" argument. The father admitted he was involved in a domestic violence incident in 2004 with the mother. The father denied any drug use and stated he disciplined his children with time outs.

On February 26, 2013, the mother and the father participated in a team decision-making meeting to decide a safety plan for the family. During the meeting, the social worker, Bryan Starks, believed the mother seemed to be in denial about her domestic violence history with the father. The mother reported she never received any injuries from the recent incident which contradicted the police report. The father also denied he "laid hands" on the mother.

The mother and the father had prior contacts with the department. On June 29, 2009, an investigation was opened concerning alleged emotional abuse of the child and M.T. The parents separately attended a gathering. The father and the child visited. The father attempted to return the child to the mother. When the mother refused, the father took the child to the police station. The mother contacted the police. The mother was advised the child was at the station. The mother arrived at the police station very upset, insisting the father be arrested for kidnapping.

The social worker attached police reports filed regarding the mother and the father's relationship. There was a valid restraining order between the mother and the father protecting her. It was issued February 16, 2010, and lasted for three years. On April 20, 2009, the police report related the father punched the mother who was holding the child, causing bruising and swelling under her right eye. On May 23, 2010, a separate police report indicated the father arrived at the mother's home and began to shout he was

going to kill her. A police report stated that in May 2010, the mother kicked the father's car after an argument regarding his ex-girlfriend. Other incidents between the mother and the father occurred on October 20, 2004, March 27, 2007, and July 7 and July 16, 2008.

## 2. Jurisdiction report

In the April 22, 2013 jurisdiction report, the social worker noted the family had three prior referrals to the department. On October 21, 1998, there was a referral alleging M.T. was sexually abused by a neighbor's minor son. There was no further contact. On January 20, 2006, there was a referral alleging sexual abuse of M.T. by the mother's boyfriend. The allegations were unfounded. The previously noted June 29, 2009 referral was found to be inconclusive. The father was previously convicted of: carrying a concealed weapon in a vehicle; inflicting corporal injury on a spouse or cohabitant; and having an unlawfully registered vehicle.

On March 1, 2013, the dependency investigator, Sonia Williams, interviewed the child. The mother insisted on being present during the interview. The child was asked whether she had witnessed her parents strike each other. The child stated: "Sometimes they fight. Sometimes my daddy hits my mommy. I don't know if they are playing. I think they are. Sometimes they yell at each other." The child would frequently look towards the mother while speaking with the investigator. The child stated she was happy and not fearful of the father.

Ms. Williams interviewed the mother that day. The mother denied the November 4, 2012 incident happened. The mother asked to tell Ms. Williams something off the record. After being told nothing was off the record, the mother stated, "I told the police he [father] threatened to kill me because I wanted to have him [father] removed." She further stated: "[The father] never told me he was going to kill me or my children. I went to court because I wanted to remove myself and the children. I did not want to separate the children. I got physical and sole custody. There was a restraining order. He

6

wasn't supposed to harass, strike or abuse me. He was watching me. Prior to him going to jail in 2009, he hit me. Prior to that, the domestic violence only happened one time. I'm kind of loud, so when I talk people assume I am arguing. I could appear to be loud. It's not that there is a physical altercation." The mother reported she completed 52 weeks of domestic violence education.

Ms. Williams also interviewed M.T. on March 1, 2013. M.T. stated: "I have never seen any violence between my mother and step father . . . . I don't know about the current situation. I was with my [maternal] grandmother. I spend a lot of time with my grandmother, aunts, and friends. I am always with them. I wasn't here the day all that happened."

The investigator interviewed the father face-to-face on April 2, 2013. The investigator informed the father the department intended to recommend services be provided. The father responded the allegations were made up. The father insisted he did not need to complete services because he completed a prior two-year domestic violence program.

Regarding the alleged November 4, 2012 incident, the father stated: "We had a disagreement. It wasn't violent. . . . Her friends and family want to see me in jail. I think they are making these allegations. There was never an altercation. I told you the 2009 incident wasn't true. I only agreed to the incident to get out of jail." The father denied telling the mother he would kill her. The father stated the mother was high-strung and spoiled. The father stated the restraining order did not require he stay away because they have a child together. The father stated the restraining order only required he not harass, stalk or threaten the mother.

Regarding the May 23, 2010 incident, the father claimed he had no clue what happened. The father said, "She . . . was having problems with someone I was messing with." Regarding the August 2012 incident, the father stated: "My sister had [the child]. As [my sister] was pulling up with my daughter, the police were at the house. [The mother] was yelling and I was calm." The father agreed that services were needed to improve their interaction and communication.

The social worker concluded, "Mother and father's denial of ongoing domestic violence is also of concern as it is likely mother and father will continue to engage in such behavior should this court not order interventions."  The social worker believed, "Mother and father appear unwilling to understand that childhood is a period of special protection and rights."  The social worker, speaking on the department's behalf, recommended, "[The child] remain in the home of the mother under [the department's] supervision under the condition that mother immediately enroll in domestic violence education, parenting education, anger management, and individual counseling to address case issues."  Regarding the father, the social worker recommended, "[F]ather receive Family Reunification Services and father be ordered to participate in [a] domestic violence program, parenting education,[and] individual counseling to address anger management[.]"  The social worker recommended the child be removed from the father's custody because there was a substantial danger to her health.  The social worker also recommended monitored visits for the father in a neutral setting.

### 3.  Jurisdiction hearing

At the April 22, 2013 jurisdictional hearing, the mother testified.  The mother denied being physically harmed by the father after the April 2009 incident.  She denied the father physically harmed her during the August or November 2012 incidents.  Regarding her statements concerning the November 2012 incident, the mother testified: "A [children services social worker] told me that he was going to take my daughter away from me if I had any contact with [the father].  So on the November incident that was just an attempt for me to get [the father] away so that they wouldn't take my children."  In response to a question concerning the parents' interaction prior to taking domestic violence classes, the mother testified:  "Well, before I would engage in -- verbally I would lash out.  . . .  I would maybe even . . . push him or something.  However, from the classes I learned to relax, to keep your hands in your pockets until it is -- to walk away, to separate.  So basically when we are not seeing eye to eye, we just . . . separate from each

8

other.  Either he will leave or I will leave, and we try it another day."  Regarding how the father treated the child, the mother testified, "Like a princess."  When asked if the father physically hurt the child, the mother testified:  "No.  He has never even hit [the child]. . . . [H]is voice is enough."

The father also testified at the jurisdiction hearing.  He stated that he was convicted of domestic violence in 2009.  The father took domestic violence classes for 52 weeks.  When asked what he learned at the classes, the father testified:  "To remain calm. To avoid altercations if possible.  And not always jump to conclusions a lot like I used to jump to conclusions a lot.  Now I am more settled and setback."  He further testified: "First I used to engage in arguments because I wanted to be right a lot.  But now I don't engage into an argument.  If it gets to a point . . . . where we get into disagree[ment] a lot . . . I will just leave, and I'll come back.  And she'll calm down, and we will be able to talk about our situation where at first we weren't able to do that."

## III.  DISCUSSION

### A.  The Sufficiency Of The Petition's Allegations

The mother argues the sustained section 300, subdivision (b) allegations fail to state a cause of action.  The mother contends the petition fails to assert facts alleging the domestic violence was perceived by or affected the child  Division Four of this appellate district has held:  "A petition, in a manner similar to a civil complaint, must contain '[a] concise statement of facts, separately stated, to support the conclusion that the minor upon whose behalf the petition is being brought is a person within the definition of each of the sections and subdivisions under which the proceedings are being instituted.' (§ 332, subd. (f).)"  (*In re Alysha S.* (1996) 51 Cal.App.4th 393, 396; see *In re T.V.* (2013) 217 Cal.App.4th 126, 131-132.)  To begin with, this issue has been forfeited.  Our colleagues in Division Four of this appellate district have held:  "We conclude [the parent] forfeited [his or her] claim by failing to demur to the petition in the trial court."

9

(*In re Christopher C.* (2010) 182 Cal.App.4th 73, 83 (*Christopher C.*); *In re David H.* (2008) 165 Cal.App.4th 1626, 1640.) (*In re Alysha S., supra,* 51 Cal.App.4th at p. 396.) *Christopher C.* is controlling. The issue is forfeited.

In any event, the mother's argument has no merit. The petition specifically alleges: "The [child's] mother . . . and father . . . have a history of engaging in violent altercations in the presence of the child. . . . On a prior occasion in 2009, the father struck the mother with the father's fist, while the mother held the child. " Thus, the petition asserted the child was directly affected because she had witnessed violent altercations. At one point the child was held by the mother when the domestic violence occurred. The petition's allegations are sufficient.

Even if there was error, no prejudice has resulted. In *Christopher C.*, our Division Four colleagues further found: "Moreover, even assuming the petition failed to state a prima facie case, [the parent] cannot establish prejudice. The purpose of the petition is to give a parent adequate notice of the allegations against him or her. [Citation.]" (*Christopher C.*, *supra*, 182 Cal.App.4th at p. 83; Cal. Const., art VI, §13.) Here, there is no evidence of prejudice. In any event, the mother has failed to demonstrate prejudice.

## B.  Section 300 Jurisdictional Findings

The mother contends the juvenile court lacked jurisdiction under section 300, subdivision (b). The mother contends that the child believed any arguing and fighting involved playing and she felt comfortable with her parents. We review the juvenile court's jurisdictional findings and orders for substantial evidence. (*In re R.C.* (2012) 210 Cal.App.4th 930, 940-941; *In re E.B.* (2010) 184 Cal.App.4th 568, 574-575; *In re J.K.* (2009) 174 Cal.App.4th 1426, 1433.) Substantial evidence is relevant evidence which adequately supports a conclusion; it is evidence which is reasonable in nature, credible and of solid value. (*In re E.B., supra,* 184 Cal.App.4th at p. 575; *In re J.K., supra,* 174 Cal.App.4th at p. 1433.) We draw all reasonable inferences from the evidence to support the findings and orders of the juvenile court. Issues of fact, weight and credibility are the

10

provinces of the juvenile court. (*In re R.C.*, *supra*, 210 Cal.App.4th at p. 941; *In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393; *In re Ricardo L.* (2003) 109 Cal.App.4th 552, 564.)

Substantial evidence supported the juvenile court's jurisdictional order. Police reports document multiple domestic violence incidents between the mother and the father. In April 2009, the father punched the mother in the face. This occurred while the mother was holding the child. In May 2010, the mother and the father argued, leading her to kick his car. In August 2012, the father locked the mother out of the house. The mother yelled at the father and refused to calm down. The child became fearful and emotionally upset. In November 2012, the father entered the home while the mother was sleeping. He woke the mother up and yelled at her. When the mother tried to escape, the father: grabbed her; shoved her into a doorjamb; choked her; and punched her. She sustained injuries to her neck and small lumps on her forehead. Prior issues occurred between the parents on October 20, 2004, March 27, 2007, and July 7 and 16, 2008. The juvenile court could reasonably find the mother's testimony protecting the father and denial of most of the incidents was indicative of a failure to protect the child from substantial harm.

Also, the child's interview with the dependency investigator revealed an awareness of the domestic violence occurring between her parents. As noted, the child related: "Sometimes they fight. Sometimes my daddy hits my mommy. I don't know if they are playing. I think they are. Sometimes they yell at each other." This demonstrated the domestic violence occurred in the child's presence and she was confused as to its impact. The restraining order against the father was ineffective. The order was issued on February 16, 2010. It was in effect for the May 2010, August 2012 and November 2012 incidents but did not curb the parents' ongoing violence. Substantial evidence supports the juvenile court's jurisdictional findings. The mother's arguments consist of a frivolous reweighing of the evidence.

## C. The juvenile court's removal order

The parents contend the juvenile court could not remove the child from the father's custody. The juvenile court's dispositional orders are reviewed for substantial evidence. (*In re I.J.* (2013) 56 Cal.4th 766, 773; *In re Heather A.* (1996) 52 Cal.App.4th 183, 193.) The father contends the juvenile court could have prohibited contact between himself and the mother and set up custody transfers through some unspecified third party.

Substantial evidence supports the juvenile court removing the child from the father's custody. As noted, a police report indicated in 2009 that the father struck the mother with his closed fist. This occurred while the mother held the child. This left a bruise under the mother's right eye. The father denied the severity of this incident. The child admitted witnessing the father sometimes hit the mother. And the child was confused as to whether such violent conduct was just playing. The father was not deterred by a restraining order from engaging in incidents with the mother in May 2010, August and November 2012. In November 2012, the father entered the mother's home and threw her against a doorjamb. The juvenile court could reasonably find removal from the father's custody was appropriate to safeguard the child from her parents' recurrent misconduct. Thus, substantial supports the juvenile court's ruling.

## D. Other aspects of the juvenile court's dispositional order

The parents challenge other aspects of the juvenile court's dispositional orders which required monitored visits for the father and parenting class and domestic violence support group for the mother. The Courts of Appeal have held, "The court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accord with this discretion." (*In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1006; see *In re Drake M.* (2012) 211 Cal.App.4th 754, 770 [same].) Further, those courts explained: "We cannot reverse the court's determination

12

in this regard absent a clear abuse of discretion.  [Citation.]  [¶]  The reunification plan "'must be appropriate for each family and be based on the unique facts relating to that family.'"  [Citation.]  Section 362, subdivision (c) states in pertinent part: 'The program in which a parent or guardian is required to participate shall be designed to eliminate those conditions that led to the court's finding that the minor is a person described by Section 300.'  [Citation.]  The department must offer services designed to remedy the problems leading to the loss of custody.'  [Citation.]"  (*In re Christopher H.*, *supra*, 50 Cal.App.4th at pp. 1006-1007; see *In re Drake M.*, *supra*, 211 Cal.App.4th at p. 770.)

Regarding the mother, the juvenile court did not abuse its discretion by requiring she take parenting classes and join a domestic violence support group.  As noted, the mother and the father have a long history of domestic violence, which she denied.  The mother took a domestic violence program which did not resolve the parents' issues.  Regarding the father, the juvenile court did not abuse its discretion by requiring his visits with the child be monitored.  The father's domestic violence with the mother was lengthy and ongoing.  The father denied the November 2012 incident occurred, despite evidence to the contrary.  The father also denied the April 2009 incident happened, claiming he pled guilty to get out of jail earlier.  The father's prior participation in a domestic violence program nor a restraining order deterred him from assaulting the mother.  The juvenile court did not abuse its discretion regarding the dispositional orders.

## IV. DISPOSITION

The April 22, 2013 jurisdictional and dispositional findings and orders are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

TURNER, P. J.

We concur:

MOSK, J.

MINK, J.*

---

* Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

14